UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.: 7 -07-CV-64

| | |
|---|---|
| MICHAEL S. ADAMS, )<br><br>Plaintiff )<br><br>vs. )<br><br>The Board of Trustees of the University of<br>North Carolina-Wilmington—M. TERRY<br>COFFEY, JEFF D. ETHERIDGE, JR.,<br>CHARLES D. EVANS, LEE BREWER<br>GARRETT, JOHN A. MCNEILL, JR., WENDY<br>F. MURPHY, LINDA A. PEARCE, R. ALLEN<br>RIPPY, SR., GEORGE M. TEAGUE, KRISTA<br>S. TILLMAN, DENNIS T. WORLEY,<br>KATHERINE L. GURGAINUS—all in their<br>individual and official capacities;<br>ROSEMARY DEPAOLO, individually and in<br>her official capacity as Chancellor of the<br>University of North Carolina-Wilmington;<br>DAVID P. CORDLE, individually and in his<br>official capacity as Dean of the College of<br>Arts and Sciences at the University of North<br>Carolina-Wilmington; KIMBERLY J. COOK,<br>individually and in her official capacity as<br>Chair of the Department of Sociology and<br>Criminal Justice at the University of North<br>Carolina-Wilmington; DIANE LEVY,<br>individually and in her official capacity as<br>former interim Chair of the Department of<br>Criminology and Sociology at the University<br>of North Carolina-Wilmington, )<br><br>Defendants. ) | **VERIFIED COMPLAINT** |

Plaintiff Michael S. Adams, by and through counsel, and for his Complaint against M.

Terry Coffey, Jeff D. Etheridge, Jr., Charles D. Evans, Lee Brewer Garrett, John A. McNeill, Jr.,

Wendy F. Murphy, Linda A. Pearce, R. Allen Rippy, Sr., George M. Teague, Krista S. Tillman,

Dennis T. Worley, and Katherine L. Gurgainus, all members of the Board of Trustees of the

1

University of North Carolina-Wilmington; Rosemary DePaolo, Chancellor of the University of North Carolina-Wilmington; David P. Cordle, Dean of the College of Arts and Sciences at the University of North Carolina-Wilmington; Kimberly J. Cook, Chair of the Department of Sociology and Criminal Justice at the University of North Carolina-Wilmington; and Diane Levy, former interim Chair of the Department of Criminology and Sociology at the University of North Carolina-Wilmington, hereby states as follows:

## INTRODUCTION

1.    The University of North Carolina-Wilmington ("UNCW" or "University") is one of sixteen (16) institutions of higher education in the University of North Carolina ("UNC") system. Many men and women pursue careers in academia at UNC to satisfy their own intellectual curiosity and because they desire to foster the same in their students. These professors desire to seek knowledge, wisdom, and truth; to challenge students to think deeply and critically about the issues of the day; and to serve the public through their own scholarship and through preparing the next generation of America's leaders. Dr. Michael Adams is one of these individuals, and for these reasons, he became an associate professor of criminology at UNCW. However, Defendants have discriminated against Dr. Adams because of his Christian and conservative beliefs and have violated his constitutional rights by punishing him for expressing his views freely.

2.    Although Dr. Adams became an associate professor at UNCW expecting a rigorous exchange of ideas with fellow faculty members as well as with students, he quickly discovered that reality was much different. Rather than encouraging vigorous debate among professors and exposing students to a variety of perspectives, Defendants have sought to silence Dr. Adams' religiously based views because they differ widely from the orthodoxy of Defendants and UNCW. When these attempts failed, Defendants launched multiple intrusive investigations—

2

often based on obviously false charges—designed only to harass and defame Dr. Adams because he exercised his First Amendment rights in a manner that Defendants disliked. Ultimately, Defendants refused to promote Dr. Adams to full professor for the same reason. Defendants initially refused to explain this decision, and only later provided an explanation, one that lacks even a pretense of credibility. As a result, Defendants have violated Dr. Adams' First Amendment right to free speech, unlawfully retaliated against Dr. Adams for exercising his First Amendment freedoms, deprived him of equal protection of the laws, discriminated against him because of his religious beliefs, and excluded him from full membership in the UNCW faculty.

### JURISDICTION AND VENUE

3.      This civil rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

4.      This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. § 2201–02; and costs and attorneys fees under 42 U.S.C. §§ 1988 and 2000e-5(k).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and/or all of the acts described in this Complaint occurred in this district.

### PLAINTIFF

6.      Plaintiff Michael S. Adams is an associate professor of criminology at UNCW, a position he has held for the past eight (8) years.

### DEFENDANTS

7.      Defendant Rosemary DePaolo is the Chancellor of the University of North Caro-

3

lina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for overseeing the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in her individual and official capacities.

8. Defendant M. Terry Coffey is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

9. Defendant Jeff D. Etheridge, Jr. is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

10. Defendant Charles D. Evans is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

11. Defendant Lee Brewer Garrett is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his

4

individual and official capacities.

12. Defendant John A. McNeill, Jr. is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

13. Defendant Wendy F. Murphy is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in her individual and official capacities.

14. Defendant Linda A. Pearce is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in her individual and official capacities.

15. Defendant R. Allen Rippy, Sr. is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

16. Defendant George M. Teague is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of

the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

17.     Defendant Krista S. Tillman is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in her individual and official capacities.

18.     Defendant Dennis T. Worley is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in his individual and official capacities.

19.     Defendant Katherine L. Gurgainus is a member of the Board of Trustees of the University of North Carolina-Wilmington, a public university organized and existing under the laws of the State of North Carolina, is responsible for the Board of Trustees' administration and policy-making, including the policies and procedures contained herein, and is sued both in her individual and official capacities.

20.     Defendant David P. Cordle, the Dean of the College of Arts and Sciences at the University of North Carolina-Wilmington, is responsible for overseeing campus administration including the policies and procedures contained herein, and is sued both in his official and individual capacities.

21.     Defendant Kimberly J. Cook, Chair of the Department of Sociology and Criminal

6

Justice at the University North Carolina-Wilmington, is responsible for overseeing campus administration including the policies and procedures contained herein, and is sued both in her official and individual capacities.

22.     Defendant Diane Levy, the former interim Chair of the Department of Criminology and Sociology at the University of North Carolina-Wilmington, is responsible for overseeing campus administration including the policies and procedures contained herein, and is sued both in her official and individual capacities.

**FACTUAL BACKGROUND**

**A. UNIVERSITY POLICIES**

23.     The University of North Carolina ("UNC") is a public university organized and existing under the laws of the State of North Carolina to accomplish the following mission:

> The University of North Carolina is a public, multi-campus university dedicated to the service of North Carolina and its people. It encompasses the 16 diverse constituent institutions and other educational, research, and public service organizations. Each shares in the overall mission of the University. That mission is to discover, create, transmit, and apply knowledge to address the needs of the individuals and society. That mission is accomplished through instruction, which communicates the knowledge and values and imparts the skills necessary for individuals to lead responsible, productive, and personally satisfying lives; through research, scholarship, and creative activities, which advance knowledge and enhance the educational process; and through public service, which contributes to the solution of societal problems and enriches the quality of life in the State. In fulfillment of this mission, the University shall seek an efficient use of available resources to ensure the highest quality in its service to the citizens of the State.

> Teaching and learning constitute the primary service that the University renders to society. Teaching, or instruction, is the primary responsibility of each of the constituent institutions. The relative importance of research and public service, which enhance teaching and learning, varies among the constituent institutions, depending on their overall missions.

A copy of the UNC mission statement is attached as Exhibit 1 to this Complaint.

24.     The University of North Carolina-Wilmington is one of these constituent institutions, and it has a similar mission:

7

The University of North Carolina at Wilmington is a public comprehensive university dedicated to learning through the integration of teaching and mentoring with research and service. The college of arts and sciences . . . seek[s] to stimulate intellectual curiosity, imagination, critical thinking, and thoughtful expression in a broad range of disciplines and professional fields. . . . Our goal is excellence in teaching, scholarship, research, artistic achievement, and service.

UNCW . . . is committed to diversity, international perspectives, and regional service. Our campus community strives to create a safe, supportive, and technologically progressive environment in which students, faculty, and staff work together to develop their interests, skills, and talents to the fullest extent.

A copy of the UNCW mission statement is attached as Exhibit 2 to this Complaint.

25. According to the Code of the Board of Governors, UNC recognizes that it can only accomplish its mission by protecting academic freedom:

The University of North Carolina is dedicated to the transmission and advancement of knowledge and understanding. Academic freedom is essential to the achievement of these purposes. The University therefore supports and encourages freedom of inquiry for faculty members and students, to the end that they may reasonably pursue these goals through teaching, learning, research, discussion, and publication, free from internal or external restraints that would unreasonably restrict their academic endeavors.

Because of this, the Board of Governors charged each constituent institution to "protect faculty and students in their responsible exercise of the freedom to teach, to learn, and otherwise to seek and speak the truth." A copy of the relevant portions of the Code of the Board of Governors is attached as Exhibit 3 to this Complaint.

26. Because the Board of Governors recognizes the value of academic freedom, it created several policies to protect this freedom. As a result, "[i]t is the policy of the University of North Carolina to support and encourage full freedom, within the law, of inquiry, discourse, teaching, research, and publication for all members of the academic staffs of the constituent institutions." (Ex. 3.) Not only does UNC encourage this freedom, but in addition "[t]he University and its constituent institutions shall not penalize or discipline members of its faculties because of the exercise of academic freedom in the lawful pursuit of their respective areas of

8

scholarly and professional interest and responsibility." (*Id.*)

27.    In accordance with the Code of the Board of Governors, the UNCW faculty hand-
book values the academic freedom of faculty members, by stating:

> The University of North Carolina at Wilmington is dedicated to the transmission
> and advancement of knowledge and understanding. Academic freedom is essen-
> tial to the achievement of these purposes. This institution therefore supports and
> encourages freedom of inquiry for faculty members and students, to the end that
> they may reasonably pursue these goals through teaching, learning, research, dis-
> cussion, and publication, free from internal or external restraints that would un-
> reasonably restrict their academic endeavors.

Like UNC, UNCW "protect[s] faculty and students in their responsible exercise of the freedom

to teach, to learn, and otherwise to seek and speak the truth." A copy of the relevant portions of

the UNCW faculty handbook is attached as Exhibit 4 to this Complaint.

28.    Further, UNCW has established policies to protect the academic freedom of faculty

members: "It is the policy of the University of North Carolina at Wilmington to support and en-

courage full freedom, within the law, of inquiry, discourse, teaching, research, and publication for

all members of the academic staff of this institution." (Ex. 4.) Thus, UNCW "will neither penalize

nor discipline members of the faculty because of the exercise of academic freedom in the lawful

pursuit of their respective areas of scholarly and professional interest and responsibility." (*Id.*)

29.    In addition to guaranteeing that its faculty members receive full academic free-

dom, UNC also guarantees that its employees will receive equal employment opportunity by

prohibiting discrimination in employment decisions. The Code of the Board of Governors sets

out UNC's policy regarding discrimination:

> Admission to, employment by, and promotion in the University of North Carolina
> and all of its constituent institutions shall be on the basis of merit, and there shall
> be no discrimination against any person on the basis of race, color, creed, religion,
> sex, national origin, age, or disability or because of the person's honorable service
> in the armed services of the United States.

A copy of the UNC Board of Governors Code provisions regarding equal opportunity is attached

9

as Exhibit 5 to this Complaint.

30.     Likewise, UNCW prohibits discrimination to ensure that all of its employees receive equal opportunity in employment, promotion, and tenure.  Its Equal Opportunity and Affirmative Action Policy states as follows:

> [UNCW] is committed to and will provide equality of . . . employment opportunity for all persons regardless of race, sex (such as gender, marital status, and pregnancy), age, color, national origin (including ethnicity), creed, religion, disability, sexual orientation, political affiliation, veteran status, or relationship to other university constituents. . . .

A copy of the UNCW Equal Opportunity and Affirmative Action Policy is attached as Exhibit 6 to this Complaint.

## B. DEFENDANTS' DISCRIMINATION AGAINST DR. ADAMS

31.     In 1993, UNCW interviewed and hired Dr. Adams as an assistant professor of criminology, a position he held for the next five (5) years.  At this time, he was an atheist who held to liberal political beliefs.

32.     Between 1993 and 2004, Dr. Adams received excellent annual reviews from two different men who served as chair of the Department of Sociology and Criminal Justice at UNCW:  Dr. Steven H. McNamee (1993–1996) and Dr. Cecil Willis (1996–2004).

33.     In conjunction with his annual report of Dr. Adams' performance, Dr. McNamee called Dr. Adams into his office.  During their conversation, Dr. McNamee praised Dr. Adams as a "master teacher" who had the "highest teaching evaluations in department history."  He also predicted that Dr. Adams would win numerous teaching awards in the future.

34.     Upon information and belief, Dr. McNamee is a liberal Democrat and a member of a liberal Catholic Church.

35.     Between 1994 and 1996, Dr. McNamee repeatedly praised Dr. Adams for his rapport with students, his conscientious advising of students and student organizations, his rigorous

10

and thorough courses, and his productive research. As early as his 1993 annual evaluation of Dr. Adams, Dr. McNamee praised him as a "gifted teacher" with "great potential as a scholar" and as a "very good department and university citizen, whose wit and charm have been a boost to the collective moral[e] of his colleagues." A copy of Dr. McNamee's 1993 annual evaluation of Dr. Adams, dated May 17, 1994, is attached as Exhibit 7 to this Complaint.

36.     In his 1994 annual evaluation of Dr. Adams, Dr. McNamee praised him in each of the four areas of the annual evaluation: teaching, advising, research, and service. He concluded, "Dr. Adams is an [sic] superb teacher, dedicated advisor, active scholar, and responsible depart-ment citizen." A copy of Dr. McNamee's 1994 annual evaluation of Dr. Adams, dated May 23, 1995, is attached as Exhibit 8 to this Complaint.

37.     In his 1995 annual evaluation of Dr. Adams, Dr. McNamee again complimented him in all four areas of the evaluation. Specifically, he noted that senior faculty members were "especially impressed by his rapport with students, his engaging presentations, and his command of the subject matter." Dr. McNamee also observed that in addition to his heavy advising caseload and productive research, Dr. Adams had served on four department committees and cultivated relationships with local media as an expert on crime-related issues. Hence, Dr. McNamee concluded, "Dr. Adams is a gifted teacher and eagerly sought after academic advisor, productive scholar, and responsible department citizen." A copy of Dr. McNamee's 1995 annual evaluation of Dr. Adams, dated June 5, 1996, is attached as Exhibit 9 to this Complaint.

38.     Dr. Willis similarly complimented Dr. Adams. Dr. Willis nominated Dr. Adams for his first teaching award in 1996 and publicly praised him when he won additional teaching awards in 1998 and 2000.

39.     Upon information and belief, Dr. Willis is a liberal Democrat and a member of a

11

Baptist church.

40. Beginning in 1995, Dr. Diane Levy and her husband, Dr. Gary Faulkner, adopted a tag-team approach to attending department meetings. As both of them taught in the department, one would attend and take notes for the other. Hence, each of them attended only half of these meetings. Their conduct was so pervasive that Dr. McNamee complained of it to Dr. Adams. However, their conduct continued, without reprimand, for at least five (5) years.

41. In 1996, Dr. Adams received his first teaching award at UNCW and was honored in the 1996 Who's Who Among College Teachers.

42. On June 20, 1996, Dr. Levy wrote a brief letter to Dr. Adams, whom she addressed as "Dear Mikey," thanking him for his contributions to the honors seminar during the spring semester of that year. In particular, she praised him for his "enthusiasm," "scholarship," "hard work," "energy," "dedication," and "creativity." All of this contributed to the "thoughtful participation and the huge contribution that [Dr. Adams] made to the program on a daily basis." A copy of Dr. Levy's letter of June 20, 1996, is attached as Exhibit 10 to this Complaint.

43. In his 1997 annual evaluation of Dr. Adams, Dr. Willis praised him as "an accomplished, gifted, and dedicated teacher, protective and talented scholar, and good departmental citizen." In particular, Dr. Willis noted that Dr. Adams had the highest objective ratings for teaching in the department, scores that were in the "excellent" range. In addition, Dr. Adams was a "conscientious and capable academic advisor," especially for transfer students, freshmen, and those seeking career advice. Yet Dr. Adams continued to have a "very productive year" in research, earning the highest research ratings in the department and causing his colleagues to place his research in the "outstanding" range. Dr. Willis concluded: "During his entire tenure at UNCW, Dr. Adams has been one of our most productive scholars. His record is clearly an im-

12

pressive one." A copy of Dr. Willis' 1997 annual evaluation of Dr. Adams, dated June 1, 1998, is attached as Exhibit 11 to this Complaint.

44.    In 1998, the Dean of Students Office recognized Dr. Adams as the UNCW Faculty Member of the Year. A copy of the award letter is attached as Exhibit 12 to this Complaint.

45.    On August 1, 1998, Dr. Adams was promoted to his current position of associate professor of criminology. In her recommendation of Dr. Adams, Dean Jo Ann Seiple recounted Dr. Adams' "outstanding teaching record," "impressive record of research," and "impressive" service record. She specifically noted that "[s]uch accomplishments are remarkable . . . for one who completed his doctorate little more than four years ago." In her opinion, Dr. Adams was a "natural teacher" and an "emerging scholar." A copy of Dr. Seiple's recommendation of Dr. Adams from November 17, 1997, is attached as Exhibit 13 to this Complaint.

46.    In his 1998 annual evaluation of Dr. Adams, Dr. Willis repeated many of the same comments from his 1997 evaluation. Again, he noted that Dr. Adams' teaching scores were in the "excellent" range, that Dr. Adams was "a most able and enthusiastic advisor," and that Dr. Adams had an "impressive" research record for the year. He also praised Dr. Adams for his departmental and community service, including his role in forming the local chapter of Amnesty International. A copy of Dr. Willis' 1998 evaluation of Dr. Adams, dated June 30, 1999, is attached as Exhibit 14 to this Complaint.

47.    In 2000, the Dean of Students Office recognized Dr. Adams as the Faculty Member of the Year for the second time. A copy of this award is attached as Exhibit 15 to this Complaint. He was also recognized again in the 2000 Who's Who Among College Teachers.

48.    In 2000, Dr. Adams experienced a great personal transformation as he re-accepted Jesus Christ as Lord and Saviour and returned to Christianity. Around this time he also became

13

politically conservative.

49. During the summer of 2000, Dr. Adams commented on the lack of ideological diversity on campus. Because of this comment, Dr. Lynn Snowden, the Faculty Senate President at the time, removed Dr. Adams from the Faculty Senate mailing list. Upon information and belief, when questioned about this decision, she wrote that she had removed Dr. Adams from the list because he was "campaigning for Bush."

50. In his 2000 annual evaluation of Dr. Adams, Dr. Willis wrote: "Dr. Adams is a skilled, passionate, and dedicated teacher, productive and enthusiastic scholar, and good departmental and university citizen. .He continues to demonstrate that he is one of the best instructors in our department and in the university." Yet again, Dr. Willis noted that Dr. Adams' teaching scores were in the "excellent" category, that Dr. Adams was a "conscientious and capable academic advisor," and that faculty peer evaluations of Dr. Adams' research placed it in the "outstanding" category. In addition, Dr. Adams chaired a departmental search committee, served on several self-study committees, and served on a UNCW Housing Grievance Committee. He continued to write newspaper columns and served on a panel before the North Carolina Legislature. A copy of Dr. Willis' 2000 annual evaluation of Dr. Adams, dated June 20, 2001, is attached as Exhibit 16 to this Complaint.

51. On September 17, 2001, Dr. Adams received an e-mail from Ms. Rosa Fuller, a UNCW student and daughter of Philosophy Professor Patti Turrisi, the director of the Center for Teaching Excellence at UNCW. Ms. Fuller's e-mail was entitled "In Dedication to an Undivided Humanity" and blamed the attacks of September 11, 2001, on the foreign policy of the United States. She sent this e-mail to seventeen e-mail addresses, addressed it "To the students and faculty of the University of North Carolina at Wilmington," and asked her readers to "forward this

14

e-mail to friends and acquaintances both on and off campus." A copy of Ms. Fuller's e-mail of September 17, 2001, is attached as Exhibit 17 to this Complaint.

52. Dr. Adams forwarded Ms. Fuller's e-mail to six (6) friends. Then he replied to Ms. Fuller by stating that "[her] 'statement' is undeserving of serious consideration. Your claimed interest in promoting rational discussion is dishonest. It is an intentionally divisive diatribe." However, Dr. Adams continued by saying, "The Constitution protects your speech just as it has protected bigoted, unintelligent, and immature speech for many years." A copy of Dr. Adams' e-mail is included in Exhibit 17 to this Complaint.

53. On September 20, 2001, Dr. Adams received a phone call informing him that Dr. Turrisi had told other University employees that she and her daughter would initiate an investigation of Dr. Adams for "verbally abusing" Ms. Fuller in his response to her manifesto. According to Dr. Turrisi, Ms. Fuller had sent the e-mail only to Dr. Adams, which is patently false, and Dr. Adams had no right to forward the e-mail to others.

54. Later that day, the secretary for the Sociology and Criminal Justice Department informed Dr. Adams that Dr. Turrisi had called the department demanding to speak with Dr. Willis, the department chairman.

55. Dr. Willis informed Dr. Adams that Dr. Turrisi demanded a list of the names of the people to whom Dr. Adams had sent Ms. Fuller's e-mail. Dr. Turrisi also wanted to know whether Dr. Adams had tried to "influence the discussion" of Ms. Fuller's e-mail. Dr. Adams replied that influencing discussions was his job, not a crime. He declined to disclose to whom he had sent the e-mail.

56. On that same day (September 20, 2001), Ms. Fuller filed a complaint with UNCW alleging that Dr. Adams had "berated [her], with no semblance of an argument, with abusive

15

epithets," the intent of which was "intimidation and defamation." She also alleged that he had sent copies of his "false representation of [her] to others, inside and outside the University community." Therefore, she insisted that the "Office of Information Technology, and any other appropriate officer or officers, . . . let me and my representatives inspect the e-mail messages Adams sent, from September 15 to September 18, as public business. . . ." She stated that if Dr. Adams had forwarded her letter to anyone, she would accuse him of libel. She also asked UNCW to block any messages sent from the e-mail address of Dr. Adams, *inter alios*. A copy of Ms. Fuller's complaint from September 20, 2001, is attached as Exhibit 18 to this Complaint.

57.    On September 21, 2001, Provost John Cavanaugh called Dr. Adams to inform him that Ms. Fuller had filed a complaint with UNCW saying that Dr. Adams had intentionally defamed and intimidated her and that she had threatened to accuse him of libel.

58.    After reading this complaint to Dr. Adams, Provost Cavanaugh said that it was not a "good idea" to make students look bad. While he assured Dr. Adams that the UNCW administration had not accessed anyone's e-mail account, he asked if there was "anything [he] needed to know" about the contents of Dr. Adams' e-mail folder. Dr. Adams objected to anyone reading his e-mail correspondence, ridiculed the notion that he was personally responsible for a flood of negative reaction to Ms. Fuller's e-mail, and threatened to take action if Dr. Turrisi continued this investigation.

59.    On September 23, 2001, Dr. Adams sent Provost Cavanaugh an e-mail to confirm the content of their conversation two days earlier. Dr. Adams asked Provost Cavanaugh to confirm (1) that UNCW had not been reading his e-mails; (2) that Mr. White was investigating whether Dr. Adams had to produce his e-mails for Ms. Fuller; (3) that UNCW preferred not to force faculty members to produce their e-mails; and (4) that Dr. Adams had never consented to

16

an examination of his correspondence. A copy of Dr. Adams' e-mail to Provost Cavanaugh on September 23, 2001, is attached as Exhibit 19 to this Complaint.

60. At 8:00 a.m. on September 24, 2001, Dr. Adams received a telephone call from Krysten Scott (now Mrs. Adams), a UNCW employee who was also taking classes. She informed him that UNCW police had called her to the UNCW police station to discuss the allegedly "threatening message" that she had sent to Ms. Fuller. The police quickly determined that Ms. Scott's message—part of which read, "People like you . . . deserve to be dragged down the street by your hair"—was not an imminent threat.

61. On September 25, 2001, Provost Cavanaugh responded to Dr. Adams' e-mail of September 23, 2001. He confirmed that (1) UNCW had not been reading Dr. Adams' e-mails; (2) that Mr. White was investigating Ms. Fuller's request; and (3) that Dr. Adams had not consented to an examination of his correspondence. However, he noted that UNCW did not require court orders in order to force professors to disclose their e-mail correspondence pursuant to legitimate public records requests. A copy of Provost Cavanaugh's e-mail of September 25, 2001, is attached as Exhibit 20 to this Complaint.

62. On September 26, 2001, Mr. Harold M. (Hal) White, Jr., the University Counsel for UNCW, sent Ms. Fuller a letter informing her that the e-mails she had requested are "either not public records or are protected from disclosure by the personnel records exception to the Public Records Act or by the federal Family Educational Rights and Privacy Act." Later in the same letter, Mr. White noted that "it is apparent from the face of the [Dr. Adams' e-mail]" that it was an "expression of personal opinion in connection with a general public discourse" and "that Dr. Adams was not speaking in his official role as a faculty member, but as an individual member of the university community." He even elaborated on this theme by stating, "[Dr. Adams]

17

was not providing evaluation to a student in one of his courses, not commenting on the academic soundness of an argument in a class, not speaking on behalf of the university, and not transacting public business on behalf of the State of North Carolina." Thus, his e-mails were personal and constitute private property. A copy of Mr. White's letter to Ms. Fuller on September 26, 2001, is attached as Exhibit 21 to the Complaint.

63.   On September 28, 2001, Ms. Fuller responded to Mr. White's letter by stating in a letter to various UNCW officials that Mr. White's opinion was "based on faulty interpretations of the applicable law and University policy." She promised to respond to Mr. White's letter at greater length, but insisted that the University preserve the e-mails in question. A copy of Ms. Fuller's letter of September 28, 2001, is attached as Exhibit 22 to this Complaint.

64.   On the same day, Mr. White e-mailed Dr. Adams informing him that UNCW had concluded that "[his] email was personal, the property of a private person" and that he was "not speaking in [his] official role as a faculty member, but rather as an individual member of the university community." However, Mr. White also outlined Ms. Fuller's objections to this position and advised Dr. Adams to preserve all documents related to the controversy until the matter was resolved. A copy of Mr. White's e-mail to Dr. Adams on September 28, 2001, is attached as Exhibit 23 to this Complaint.

65.   On October 1, 2001, Ms. Fuller responded to Mr. White's letter of September 28, 2001, insisting that the e-mail messages she requested were public records and were not protected from disclosure. She argued that Mr. White's letter was "based on irrelevant laws, misinterpreted policies, and arbitrary definitions." Hence, she again demanded to inspect the e-mail messages that Dr. Adams sent during September 15–18, 2001. A copy of Ms. Fullers' letter of October 1, 2001, is attached as Exhibit 24 to this Complaint.

18

66.     In a telephone conversation on October 10, 2001, Mr. White again instructed Dr. Adams to preserve all of his e-mail messages.

67.     Between October 3–11, 2001, Mr. White and Ms. Fuller exchanged more letters, with Ms. Fullers' becoming increasingly hostile and sarcastic. Mr. White remained steadfast in his position that the e-mails were not public records and reiterated that UNCW would not force Dr. Adams to produce his e-mails for inspection. Ms. Fuller continued to demand that UNCW allow her to inspect all of the non-confidential e-mails Dr. Adams sent during September 15–18, 2001. These letters between Mr. White and Ms. Fuller are attached as Exhibit 25 to this Complaint.

68.     On October 15, 2001, Ms. Fuller wrote Mr. White demanding a final decision as to whether she or her representatives could have access to the requested e-mail messages. After repeating her demands, she concluded:

> If the University refuses to do an inventory of the e-mail letters Mike Adams sent on the relevant dates, or refuses to let me see his "official" messages, other than ones exempt under the law, then it stands in open and absolute defiance of State law. The matter will then have to be finally decided in another forum.

A copy of Ms. Fuller's letter of October 15, 2001, is attached as Exhibit 26 to this Complaint.

69.     In response to Ms. Fuller's letter of October 15, 2001, Provost Cavanaugh called Dr. Adams to inform him that UNCW would have to work with him to determine which e-mail messages in the relevant time period were public records. Provost Cavanaugh instructed Dr. Adams to call Mr. White for further details.

70.     When Dr. Adams spoke with Mr. White, Mr. White said that he would visit Dr. Adams' office later that week with a member of the Information Technology Systems Division ("ITSD") to find and inspect the messages Dr. Adams sent during September 15–18, 2001. However, when Mr. White and Ellen Gurganious (from ITSD) visited Dr. Adams' office, they found no such messages because Dr. Adams had deleted them as a routine practice before Mr. White's in-

19

structions of September 28, 2001.

71.     As Mr. White and Ms. Gurganious were leaving his office, Dr. Adams said, "I know you can't comment on what I have to say, but this is a truly psychotic act of retaliation over nothing more than petty difference of political opinion." Both of them agreed, and Mr. White apologized for the intrusion. Mr. White had previously told Dr. Adams that the whole thing was, in his opinion, an act of retaliation and political harassment.

72.     After this, Mr. White contacted Ms. Scott (now Mrs. Adams) and Dr. Donna King, a UNCW professor, to inform them that UNCW would be checking its backup tapes in order to read the messages that Dr. Adams had sent them as part of its investigation into whether these messages needed to be turned over to Ms. Fuller and her family. Both Ms. Scott and Dr. King objected to this invasion of their privacy.

73.     After consulting with her attorney, Ms. Scott demanded to be present if any of the messages sent to her account were opened. Mr. White agreed. Dr. King made no such request.

74.     On October 25, 2001, Mr. White, Dr. Adams, and Ms. Scott met in Mr. Mike Sheehan's office at ITSD to open and read the e-mail messages so as to determine whether they were private correspondence or public records. Mr. Sheehan opened the meeting by saying, "This wasn't my decision," and, "I get no joy out of what is happening here today." The backup tapes contained two messages from Dr. Adams to Ms. Scott. Mr. White read enough of them to conclude that they were private correspondence.

75.     Next, Mr. White informed both Dr. King and Dr. Adams that they were required to let Mr. White and Mr. Sheehan inspect their office computers. Both Dr. Adams and Dr. King indicated that Mr. White would be doing so over their objection. However, Mr. White's search revealed that neither professor archived sent mail, and thus, no e-mail message was recovered.

20

76.     After this meeting, Mr. White wrote Ms. Fuller a letter stating that the two messages recovered from the backup tapes were not public records, and thus, she would not receive a copy of them. However, he agreed to give her and her family other information concerning Dr. Adams' e-mail communications. A copy of Mr. White's letter to Ms. Fuller on October 25, 2001, is attached as Exhibit 27 to this Complaint.

77.     On October 29, 2001, Ms. Fuller accused Dr. Adams of libel in a complaint to UNCW. She alleged that the request in her original e-mail that readers forward her message to others applied *only* to those who agreed with her perspective. Thus, Dr. Adams' distribution of her e-mail was improper and constituted libel. A copy of Ms. Fullers' complaint of October 29, 2001, is attached as Exhibit 28 to this Complaint.

78.     On November 9, 2001, Dr. Adams appeared as a guest on the Fox News television show *Hannity & Colmes* to discuss the unfolding controversy surrounding Ms. Fuller's e-mail and UNCW's decision to search Dr. Adams' e-mail account to try to find evidence supporting her specious claims. A transcript of the *Hannity & Colmes* broadcast from November 9, 2001, is attached as Exhibit 29 to this Complaint.

79.     On November 27, 2001, Dr. Lynn Snowden falsely charged Dr. Adams with a "hate crime." In her charge of second degree breaking and entering, she alleged to UNCW police that Dr. Adams broke into her office to spray a poison gas, which she alleged was tear gas, in an attempt to poison her. The State Bureau of Investigation (SBI) investigated this charge of "workplace terrorism" by interrogating Dr. Adams and taking swatches from the "crime scene" (i.e. Dr. Snowden's office) to identify the poison. This investigation remained open until April of 2006.

80.     In response to e-mails supportive of Dr. Adams that were sent from individuals across the country, Provost Cavanaugh composed a form response that falsely (1) denied that Dr.

21

Adams had ever been "investigated, threatened, or sanctioned for saying anything"; (2) claimed that UNCW had fully supported Dr. Adams' free speech; (3) claimed that Dr. Adams even said on national television that UNCW had protected his free speech; (4) claimed that UNCW did not turn over any records to Ms. Fuller. A copy of Provost Cavanaugh's form response is attached as Exhibit 30 to this Complaint.

81.　In April 2002, Dr. Adams informally requested that all records, items, reports, and transcripts related to the investigation of Dr. Snowden's alleged incident of "workplace terrorism" be disclosed to him. When these requests failed, he formally requested the same in a letter to Mr. White on May 3, 2002. A copy of Dr. Adams' letter of May 3, 2002, to Mr. White is attached as Exhibit 31 to this Complaint.

82.　In May 2002, Dr. Adams published his first column that criticized UNCW and its Department of Sociology and Criminal Justice for religious intolerance. This decision created immediate and palpable tension in the department, tension that some characterized as an "uproar." A copy of Dr. Adams' column, entitled *The Campus Crusade Against Christ*, is attached as Exhibit 32 to this Complaint.

83.　In his 2001 annual evaluation of Dr. Adams, Dr. Willis reiterated that Dr. Adams "is a talented, dedicated and passionate teacher, an active scholar, and good departmental and university citizen. He continues to demonstrate that he is one of the most skilled instructors in our department and in the university." Once again, Dr. Adams' teaching scores were in the "excellent" category, and faculty peer evaluations of his research placed him in the "good" category. He served as a "conscientious and capable academic advisor" and participated in numerous department and university committees. A copy of Dr. Willis' 2001 annual evaluation of Dr. Adams, dated May 28, 2002, is attached as Exhibit 33 to this Complaint.

22

84. Upon information and belief, in March 2003, Dr. Jammie Price cancelled class for one (1) full week in order to protest Operation Iraqi Freedom. She gave students extra credit for assisting her in this protest and used the department copy card to cover the cost of producing the anti-war fliers.

85. In his 2002 annual evaluation of Dr. Adams, Dr. Willis repeated many of his comments from his 2001 annual evaluation. In addition to noting Dr. Adams' "excellent" teaching scores, his research, and his department and university service, Dr. Willis praised Dr. Adams for his community service in the form of three public lectures and appearances on radio talk shows. A copy of Dr. Willis' 2002 annual evaluation of Dr. Adams, dated June 3, 2003, is attached as Exhibit 34 to this Complaint.

86. In his 2003 annual evaluation of Dr. Adams, Dr. Willis noted that Dr. Adams "is an enthusiastic, knowledgeable, and skilled instructive and active researcher who is involved in varied service activities, especially in the larger community. He remains, by all indications, one of the most skilled and popular instructors in our department and the university." In addition to commenting on Dr. Adams' "excellent" teaching scores, "good" to "outstanding" course materials, and continuing research, Dr. Willis praised Dr. Adams for his service on department committees and as an advisor to various student organizations. Furthermore, he praised Dr. Adams for his community service, which "included an internet column and guest appearances on television talk shows and on nationally syndicated radio programs." A copy of Dr. Willis' 2003 annual evaluation of Dr. Adams, dated May 26, 2004, is attached as Exhibit 35 to this Complaint.

87. In sum, Dr. Adams carried on an active and vigorous research operation, resulting in ten (10) peer-reviewed publications, a list of which is attached as Exhibit 36 this Complaint. In addition, he authored or co-authored seven (7) other publications between 1991 and 2004, a list of which is attached as Exhibit 37 to this Complaint.

23

88.     Upon information and belief, the two previous chairs of the department—Drs. McNamee and Willis—had stated that ten peer-reviewed publication as a "safe" number to secure promotion to full professor.

89.     Besides teaching and research, Dr. Adams has been active in his service to the community.  His service activities include sitting on or leading various University boards and committees, sitting on or leading various department committees, advising a variety of student organizations, and utilizing his weekly column and national appearances to support academic freedom and assist students in defending their First Amendment freedoms.  A complete list of Dr. Adams' community service activities is attached as Exhibit 38 to this Complaint.

90.     In April 2004, Dr. Willis specifically requested that Dr. Adams not discuss the content of his nationally syndicated columns at work.  Apparently, his columns made the department secretary, Mrs. Donna Dugan, feel "uncomfortable," causing her to become hysterical and leave the office.

91.     Although Dr. Adams complied with Dr. Willis' request, Mrs. Dugan continued to download and read Dr. Adams' columns while at work.  Over the next six months, she also criticized the content of these columns at work, even in front of student employees.

92.     In response to Mrs. Dugan's behavior (i.e. criticizing a column after demanding that the author be prevented from discussing it), Dr. Adams wrote a column that obliquely referred to her behavior.  As expected, she downloaded the column and read it while at work. Though it did not mention her by name, Mrs. Dugan reacted to it by yelling, crying, slamming the door, and leaving the workplace for the last six hours of the day.  A copy of Dr. Adams' column from October 19, 2004, entitled *Unanswered Questions: 2004 (Part II)*, is attached as Exhibit 39 to this Complaint.

93.     In 2004, Dr. Adams decided to apply for promotion to full professor.  To facilitate this, he met with the then-Interim Chair of the department, Dr. Diane Levy, to discuss the process of promotion.  Dr. Adams provided her with a list of his ten (10) peer-reviewed publications and requested that she let him know whether they would be sufficient for promotion.

94.     Upon information and belief, Dr. Levy is an outspoken feminist, is politically liberal, and is of Jewish descent.

95.     Dr. Levy did not respond to Dr. Adams until ten (10) months later, when she filed his 2004 annual evaluation.  At that time, she speculated that his political activities (e.g., speeches, columns, and media appearances) interfered with his job performance, impeded his departmental service, and caused his research productivity to decline.  She complained that Dr. Adams' efforts were focused elsewhere, expressed her distaste for his "political activity," and alleged that he had done little service for UNCW.  A copy of Dr. Levy's 2004 annual evaluation of Dr. Adams, dated June 1, 2005, is attached as Exhibit 40 to this Complaint.

96.     On October 19, 2004, Dr. Levy met with Dr. Adams to reprimand him for his weekly nationally syndicated column.  During this meeting with Dr. Adams, Dr. Levy congratulated herself on not saying anything about his column for her three months as interim chair.  Despite her statement that "[she k]now[s] there's the First Amendment and all that," she criticized Dr. Adams for the content and tone of his columns.  She requested that he change his writing style so that it would be less "caustic" and more "cerebral" like William F. Buckley because doing so "would make things a whole lot more pleasant around the office."

97.     On August 1, 2005, Dr. Kimberly J. Cook became chair of the Department of Sociology and Criminal Justice at UNCW.  Upon information and belief, Dr. Cook is a feminist atheist who has been openly critical of Christianity.

25

98.     Upon information and belief, during the 2005–06 academic year, Dr. Cook said the following to the recruitment committee: "My image of a perfect job candidate is a lesbian with spiked hair and a dog collar."[1]

99.     On August 1, 2005, Dr. Susan Bullers became the director of UNCW's Women's Resource Center. At that time, she was given the option of whether or not to attend departmental meetings. Although she initially chose not to attend, she did decide to attend at least one (1) of the fifteen (15) meetings since she assumed her position.

100.    In March or April of 2006, Dr. Adams met with Dr. Cook regarding Dr. Snowden's charges of a "hate crime" and "workplace terrorism," charges that remained open since November 27, 2001. Dr. Cook then approached William Fleming about Dr. Adams' concerns, and Dr. Fleming promised to look into the situation. A copy of Dr. Fleming's e-mail to Dr. Adams on April 5, 2006, is attached as Exhibit 41 to this Complaint.

101.    On April 5, 2006, Dr. Fleming received a memorandum from David M. Donaldson, Chief of Police, summarizing the investigation into Dr. Snowden's charges. This memorandum states that Dr. Adams was not involved and that the SBI found no evidence of poison. Thus, Chief Donaldson concluded that the case was "unfounded." A copy of Chief Donaldson's memorandum of April 5, 2006, is attached as Exhibit 42 to this Complaint.

102.    On April 13, 2006, Dr. Fleming sent Dr. Adams and Dr. Cook a memorandum outlining the results of his investigation. He concluded that "the disposition of this matter was communicated verbally within the college but written closure was apparently not provided to Dr. Adams or other parties." A copy of Dr. Fleming's memorandum of April 13, 2006, is attached

---

[1]     The most senior member of the Criminal Justice faculty, who was also present at the time, remembers the statement as follows: "My image of a perfect job candidate is a lesbian with purple hair and a dog collar."

as Exhibit 43 to this Complaint.

103.    On June 5, 2006, Dr. Cook filed her 2005 annual evaluation of Dr. Adams. After recounting his accomplishments as a teacher, research efforts, and service both on and off campus, she concluded that "Dr. Adams['] work performance is satisfactory in all areas of review." A copy of Dr. Cook's 2005 annual evaluation of Dr. Adams, dated June 5, 2006, is attached as Exhibit 44 to this Complaint.

104.    In 2006, Dr. Adams produced his eleventh peer-reviewed publication and applied again for promotion under the new chair of the Department of Sociology and Criminal Justice, Dr. Kimberly J. Cook. Upon information and belief, Dr. Cook deleted a faculty member's evaluation of Dr. Adams that criticized him for his "political activity" and helped to clear Dr. Adams of the false hate crime charges that Dr. Snowden filed in 2001. When they met to discuss this evaluation and Dr. Snowden's charges, Dr. Cook said: "I like you, Mike. You're a good person. You're always good for a laugh. I like your energy. I like your optimism. I like what you're doing in the department." The day before Dr. Adams submitted his application for promotion, Dr. Cook told him that "everything looks good." A copy of Dr. Adams' application for promotion to full professor is attached as Exhibit 45 to this Complaint.

105.    Despite the new scholarship and Dr. Cook's statements, Defendants refused to promote Dr. Adams to full professor in a meeting on September 14, 2006. When Defendants announced this decision via e-mail the next day, they did not give Dr. Adams any explanation.

106.    On September 15, 2006, Dr. Adams sent Dr. Cook an e-mail requesting an explanation for this decision. When she offered to discuss it in person, he insisted on receiving a written justification for purpose of appealing the decision. Dr. Cook responded by saying, "Hi Mike, yes, of course I understand," and promised to send him a written explanation "very soon." Copies of

27

these e-mails between Dr. Cook and Dr. Adams are attached as Exhibit 46 to this Complaint.

107. On September 20, 2006, Dr. Adams sent Dr. Cook another e-mail renewing his request for a written explanation and clarifying that he also wanted to know the results of the vote. A copy of Dr. Adams' e-mail to Dr. Cook on September 20, 2006, is attached as Exhibit 47 to this Complaint.

108. On September 21, 2006, Dr. Cook sent Dr. Adams a letter which began by stating, "I am disappointed that you declined my invitation to discuss personally the decision on your promotion." After outlining the materials used to make the decision, she noted that "[t]he senior faculty on the Department, in an overwhelming consensus, did not support your promotion to professor at this time." However, she also observed that the chair has the final decision on the matter saying, "In my view your record does not merit promotion to professor at this time." A copy of Dr. Cook's letter of September 21, 2006, is attached as Exhibit 48 to this Complaint.

109. On September 27, 2006, Dr. Adams sent an e-mail to Dr. Cook demanding a written justification for this decision. In particular, he requested that she explain the reason for the senior faculty's "overwhelming consensus" and the basis for her conclusion that "[his] record does not merit promotion to professor at this time." A copy of Dr. Adams' e-mail of September 27, 2006, is attached as Exhibit 49 to this Complaint.

110. On September 29, 2006, Dr. Cook responded to Dr. Adams' request. In her memorandum, she stated that Dr. Adams was deficient in all three areas of consideration: scholarship, teaching, and service. In particular, she alleged the following:

> The overriding concern regarding your record to date is the area of scholarly research productivity. The scholarly criterion for promotion to professor requires that a "tangible record of research" is accomplished to merit promotion. Since your last promotion in 1998, your scholarly productivity in peer-reviewed venues does not demonstrate a cumulative "tangible" pattern of academic expertise in sociology, criminology and/or criminal justice to merit promotion to professor at

28

this time. The teaching criterion for promotion to professor requires one to have documented "distinguished accomplishment" in that professional area. While your teaching record is the strongest aspect of your application for promotion thus far, it does not satisfy this standard. The service criterion requires a "significant record" of service . . . . Your service record to the university and to the academic disciplines of sociology, criminology and/or criminal justice is judged to be insufficient for promotion.

Furthermore, she stated that the "overwhelming consensus of the senior faculty" voted against promoting Dr. Adams to full professor. Thus the vote "was not 'close.'" A copy of Dr. Cook's memorandum of September 29, 2006, is attached as Exhibit 50 to this Complaint.

111. Shortly after Dr. Adams discussed the situation with the most senior member of the Criminal Justice faculty, who served on the tenure committee. This professor remarked that this was the toughest decision the committee had made in over twenty (20) years. Upon information and belief, when Dr. Adams recounted Dr. Cook's conclusion that he was deficient in all three areas, this professor retorted, "B*** s***! That isn't the way the department voted!"

112. On December 18, 2006, Dr. Cook sent Dr. Adams an e-mail explaining that he must include all of his speaking engagements in his list of external professional activities for pay. At the same time, she noted that he had missed three (3) of five (5) department meetings and a search committee meeting during the semester. In so doing, she applied a faculty absence policy that pertains to absences from class to absences from department meetings. A copy of Dr. Cook's e-mail of December 18, 2006, is attached as Exhibit 51 to this Complaint.

113. Upon information and belief, on December 18, 2006, Dr. Cook also approved a phased retirement package for Dr. David Evans, a registered Democrat and outspoken critic of Christianity. This package will allow him to draw a salary from UNCW during the next two years as he teaches two online classes. During this time, he will reside in Columbus, Ohio, hold a full-time job with the Ohio Department of Education, and be exempt from all department meetings and committee assignments.

29

114.    On December 28, 2006, the most senior member of the Criminal Justice faculty e-mailed Dr. Adams to inform him that the search committee meeting would be delayed until January 8, 2007.  At the time, the search committee ran the very serious risk of losing candidates, and thus, it was imperative that it meet.  However, Dr. Cook requested that the meeting be post-poned because she did not return from her personal vacation until January 8, 2007.  Faculty and staff were supposed to report for the new semester on January 5, 2007.  A copy of the e-mail ex-change between Dr. Adams and the most senior member of the Criminal Justice faculty is at-tached as Exhibit 52 to this Complaint.

115.    On February 15, 2007, Dr. Adams filed a charge of discrimination with the Equal Employment Opportunity Commission's ("EEOC") Raleigh Area Office.  In this charge, Dr. Adams stated that Defendants had discriminated against him based on his religion and retaliated against him for exercising his First Amendment freedoms.  He requested that the EEOC issue a right-to-sue letter without waiting the full period (i.e., 180 days) for an investigation.  A copy of Dr. Adams' EEOC charge, including its cover letter, is attached as Exhibit 53 to this Complaint.

116.    On March 12, 2007, Thomas M. Colclough, the director of the EEOC Raleigh Area Office, sent Dr. Adams a Notice of Right to Sue via the United States Postal Service.  This letter stated that Dr. Adams had ninety (90) days to file suit based on the claims in his charge.  A copy of the EEOC's Notice of Right to Sue is attached as Exhibit 54 to this Complaint.

117.    To date, Dr. Adams has not received a promotion to full professor.

118.    Each of the adverse actions outlined above, from the improper investigation of Dr. Adams' protected speech activities, to the violation of his rights of privacy, to the multi-year long open investigation into the (false) allegation of a tear gas attack against a colleague, to the applica-tion of double standards that hold Dr. Adams to a higher standard of conduct than his more secular

30

and more liberal colleagues, to the denial of promotion to full professor were based in whole or in part upon his identity as a Christian of conservative theological and political beliefs.

FIRST CAUSE OF ACTION

**First Amendment Retaliation
(42 U.S.C. § 1983)**

119.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

120.    By subjecting Dr. Adams to numerous, intrusive, and harassing investigations, asking him to terminate his First Amendment activities, and refusing to promote him to full professor because of his outspoken Christian and conservative beliefs, Defendants by policy and practice have retaliated against Plaintiff because of his free expression and deprived him of his ability to freely express his ideas on issues of public concern at UNCW.

121.    Defendants, acting under color of state law, and by policy and practice, have explicitly and implicitly retaliated against Plaintiff for exercising his clearly established right to free speech on issues of public concern as secured by the First Amendment to the United States Constitution.

122.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

123.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

SECOND CAUSE OF ACTION

**Violation of Plaintiff's First Amendment Right to Freedom of Speech
(Viewpoint Discrimination)
(42 U.S.C. § 1983)**

124.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

31

125.     By subjecting Plaintiff to numerous, intrusive, and harassing investigations, asking him to terminate his First Amendment activities, and refusing to promote him to full professor because of his outspoken Christian and conservative beliefs, Defendants by policy and practice have discriminated on the basis of viewpoint and deprived Plaintiff of his ability to express his ideas freely on issues of religious concern at UNCW.

126.     Defendants, acting under color of state law, and by policy and practice, have explicitly and implicitly discriminated against Plaintiff for exercising his clearly established right to free speech on issues of public concern as secured by the First Amendment to the United States Constitution.

127.     Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

128.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### Violation of Dr. Adams' Fourteenth Amendment Right to Equal Protection of the Law (42 U.S.C. § 1983)

129.     Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

130.     By subjecting Plaintiff to numerous, intrusive, and harassing investigations, asking him to terminate his First Amendment activities, and refusing to promote him to full professor because of his outspoken Christian and conservative beliefs, Defendants by policy and practice have treated Plaintiff differently than similarly-situated professors and deprived Plaintiff of his ability to freely express his ideas on issues of public concern at UNCW.

32

131.    Defendants, acting under color of state law, and by policy and practice, have explicitly and implicitly discriminated on the basis of viewpoint and deprived Plaintiff of his clearly established right to equal protection of the law secured by the Fourteenth Amendment to the United States Constitution.

132.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

133.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### Violation of Title VII's Protection Against Religious Discrimination (42 U.S.C. § 2000e)

134.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

135.    By subjecting Plaintiff to numerous, intrusive, and harassing investigations, asking him to terminate his First Amendment activities, and refusing to promote him to full professor because of his outspoken Christian and conservative beliefs, Defendants by policy and practice have discriminated against Plaintiff on the basis of religion.

136.    Defendants, acting under color of state law, and by policy and practice, have explicitly and implicitly discriminated on the basis of religion and deprived Plaintiff of his clearly established right to equal employment opportunity secured by the Civil Rights Act of 1964.

137.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

33

138. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

WHEREFORE, Plaintiff Michael S. Adams respectfully requests that the Court enter judgment against Defendants M. Terry Coffey, Jeff D. Etheridge, Jr., Charles D. Evans, Lee Brewer Garrett, John A. McNeill, Jr., Wendy F. Murphy, Linda A. Pearce, R. Allen Rippy, Sr., George M. Teague, Krista S. Tillman, Dennis T. Worley, Katherine L. Gurgainus, members of the Board of Trustees of the University of North Carolina-Wilmington; Rosemary DePaolo, Chancellor of the University of North Carolina-Wilmington; David P. Cordle, Dean of the College of Arts and Sciences at the University of North Carolina-Wilmington; Kimberly J. Cook, Chair of the Department of Sociology and Criminal Justice at the University of North Carolina-Wilmington; and Diane Levy, former interim Chair of the Department of Criminology and Sociology at the University of North Carolina-Wilmington, and provide Plaintiffs with the following relief:

(A)    A declaration stating that Defendants violated Dr. Adams' right to free speech on matters of public concern;

(B)    A declaration stating that Defendants violated Dr. Adams' right to equal protection under the law;

(C)    A declaration stating that Defendants discriminated against Dr. Adams' on the basis of religion;

(D)    A declaration that Dr. Adams be given immediate status as a tenured full professor;

(E)    Monetary damages (including punitive damages for Defendants actions in their individual capacities) for infringing Dr. Adams' exercise of his First and Fourteenth Amendment rights;

(F)    Dr. Adams' reasonable attorneys' fees, costs, and other costs and disbursements

34

in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k); and

(G)     All other further relief to which Dr. Adams may be entitled.

Respectfully submitted this 9th day of April, 2007.

s/Robert M. Schmidt
ROBERT M. SCHMIDT
North Carolina Bar No. 12545
Patrick Henry Justice Center
444 South Main Street
Laurinburg, North Carolina 28352
(910) 266–9017
(910) 266–9006—facsimile
lawofliberty@bellsouth.net
LR 83.1 Counsel

DAVID A. FRENCH
Tennessee Bar No. 16692
Kentucky Bar No. 86986
Alliance Defense Fund
7141 Old Zion Road
Columbia, Tennessee 38401
(931) 490–0591
(931) 490–7989—facsimile
dfrench@telladf.org

BENJAMIN W. BULL (*of counsel*)
Arizona Bar No. 009940
TRAVIS C. BARHAM
Arizona Bar No. 024867
Alliance Defense Fund
15333 N. Pima Rd., Suite 165
Scottsdale, Arizona 85260
(480) 444–0020
(480) 444–0028—facsimile
bbull@telladf.org

DAVID J. HACKER
Illinois Bar No. 6283022
Alliance Defense Fund
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932–2850
(916) 932–2851—facsimile
dhacker@telladf.org

**ATTORNEYS FOR PLAINTIFF**

35

## VERIFICATION OF COMPLAINT

I, Michael S. Adams, a citizen of the United States and resident of the State of North Carolina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 31 day of March, 2007, at Wilmington, North Carolina.


Michael S. Adams
Associate Professor of Criminology
University of North Carolina-Wilmington