IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:07-CV-64-H

MICHAEL S. ADAMS,                          )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )
                                           )
THE TRUSTEES OF THE UNIVERSITY             )
OF NORTH CAROLINA-WILMINGTON, M.           )
TERRY D. COFFEY, JEFF D. ETHERIDGE,        )
JR., CHARLES D. EVANS, LEE                 )
BREWER GARRETT, JOHN A. MCNEILL,           )
JR., WENDY F. MURPHY, LINDA A.             )
PEARCE, R. ALLEN RIPPY, SR.,               )
GEORGE M. TEAGUE, KRISTA S.                )
TILLMAN, DENNIS T. WORLEY,                 )
KATHERINE L. GURGAINUS, all in             )
their individual and official             )
capacities; ROSEMARY DEPAOLO,              )
individually and in her official          )
capacity as Chancellor of the             )
University of North Carolina-              )                    **ORDER**
Wilmington; DAVID P. CORDLE,               )
individually and in his official          )
capacity as Dean of the College           )
or Arts and Sciences at the               )
University of North Carolina-             )
Wilmington; KIMBERLY J. COOK,              )
individually and in her official          )
capacity as Chair of the                   )
Department of Sociology and                )
Criminal Justice at the                    )
University of North Carolina-             )
Wilmington; and DIANE LEVY,                )
individually and in her official          )
capacity as former interim Chair          )
of the Department of Criminology          )
and Sociology at the University           )
of North Carolina-Wilmington,             )
                                           )
        Defendants.                        )

This matter is before the court on defendants' motion for summary judgment. Plaintiff has responded, and defendants have replied. The motion is ripe for adjudication.

## STATEMENT OF THE CASE

Plaintiff Michael S. Adams, a tenured associate professor at the University of North Carolina-Wilmington (UNCW), brought this action against sixteen defendants: UNCW's Chancellor, Rosemary DePaolo; twelve members of UNCW's Board of Trustees; Dr. David Cordle, Dean of the College of Arts and Sciences; Dr. Diane Levy, the former interim Chair of the Department of Sociology and Criminal Justice (the "Department"); and the Department's current chair, Dr. Kimberly Cook. Plaintiff alleges that defendants retaliated against him for his Christian and politically conservative speech by denying his application for promotion to full professor and by subjecting him to intrusive investigations. Plaintiff seeks declaratory relief and monetary damages, alleging (1) religious discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 (2000) ("Title VII"); (2) viewpoint discrimination and retaliation for protected expression, in violation of 42 U.S.C. § 1983 and the First Amendment; and, (3) denial of equal protection of the laws, in violation of § 1983 and the Fourteenth Amendment. The court previously dismissed plaintiff's claims for monetary damages

2

against defendants in their official capacities and plaintiff's Title VII claims against defendants in their individual capacities.

## STATEMENT OF THE FACTS

The court herein recites the facts in the light most favorable to plaintiff, the nonmoving party.

## I. Events Preceding Plaintiff's Application for Promotion

In 1993, plaintiff was hired as an assistant professor of criminology at UNCW. At that time, plaintiff was an atheist with liberal political beliefs. Plaintiff earned numerous awards and accolades in his initial years of teaching. He earned strong teaching evaluations, amassed an impressive collection of publications, received outstanding peer reviews, and established an exemplary record of service to the Department, UNCW, and the community. He earned two Faculty Member of the Year awards. And in 1998, he was promoted to associate professor, a tenured position.

In 2000, plaintiff became a Christian and a political conservative. After this, plaintiff continued to earn praise from the department chair as one of the university's best instructors, and for his scholarship and service.

In early 2001, plaintiff sent emails to his colleagues voicing concern about the questioning of candidates for employment regarding their political preferences, and faculty

members airing anti-religious sentiments during the interview process. Plaintiff engaged in an email exchange with another faculty member, Dr. Lynne Snowden ("Snowden") (not a defendant here), about the propriety of basing hiring decisions on political orientation. (Pl.'s Resp. Ex. 1, pp. 1-3.)

On September 15, 2001, a UNCW student sent an email to a number of students and faculty members, including plaintiff, blaming the September 11 attacks on U.S. foreign policy. Plaintiff responded two days later, calling the student's email "bigoted, unintelligent, and immature," but noting that the Constitution protected her writing, just as it protected his response. (Compl. Ex. 17.) On September 20, the student filed a complaint with UNCW alleging that plaintiff's email message, using university computing facilities and services, intended to intimidate and defame her, and in doing so violated the Code of Student Life and UNCW personnel policies. She demanded an investigation and specifically asked that the university allow her to view email messages sent by plaintiff to others, to ascertain what, if any, exchanges plaintiff had engaged in regarding the student's emails.[1]

---

[1]The complaint filed by the student with the university also highlighted three email messages from other senders that troubled her, two of which made her fear for her personal safety and all of which, she asserted, constituted defamation, intimidation, and/or the communication of threats.

4

The university undertook considerable efforts to prevent anyone inside or outside the administration from viewing plaintiff's emails--efforts plaintiff acknowledged when he appeared on the television program Hannity & Colmes to discuss the incident. (Compl. Exs. 21-30.)[2] In fact, UNCW rejected the student's initial request to access plaintiff's emails, stating the university's position that the emails were personal and thus not subject to the student's public records request. When the student objected, offering a contrary view of the pertinent state law, the university reaffirmed its position and informed the student that it would not force the faculty member to produce the requested emails for inspection. (Compl. Ex. 25.) The student again offered objections grounded in her analysis of the state public records law, and the university again defended plaintiff, this time telling the student, "The decision of the University is final." (Id.) Only when the student responded a fourth time, threatening legal action, did the university partially relent, with the university counsel requesting that the information technology department attempt to retrieve and examine messages sent by plaintiff on the dates in question. And even then, the university did not turn any of the subject

_____

[2]The university's efforts and plaintiff's public acknowledgement of them make it extremely surprising that the plaintiff herein refers to the university's subsequent actions, detailed here, as an "intrusive investigation" into his emails (Pl.'s Resp. Br. at 3).

5

emails over to the student, deeming them private correspondence and not public records. (Compl. Ex. 27.)

In November 2001, Snowden (again, not a defendant here) accused plaintiff and the department chair, Dr. Cecil Willis ("Willis"), of "workplace terrorism" and a "hate crime," claiming they had sprayed an "unknown gas" or "pepper spray" in her office. Both men were cleared of wrongdoing. (Compl. Ex. 41-43.)

In May 2002, plaintiff published a column criticizing UNCW and the department for alleged religious intolerance. Later the same month, plaintiff received a positive evaluation for the prior year from Willis, the department chair. In September 2003, plaintiff began writing a column for the website Townhall.com. His column focused on the cultural and ideological climate on university campuses, including issues of academic freedom, constitutional abuses, discrimination, race, gender, homosexual conduct, feminism, Islamic extremism, and morality. It also showcased plaintiff's conservative religious beliefs. Soon after plaintiff started writing the column, university administrators and faculty members were inundated with a flood of complaints from upset readers, including potential donors. In email exchanges with one another, faculty, administrators, and trustees pointed to the column's lack of intellectual rigor, likened it to talk show rhetoric, and voiced

6

their hope that the column and the controversy would quietly go away. (Pl.'s Resp. Ex. 3.) In spite of the controversy, in 2003, plaintiff received a positive evaluation for the prior year.

In April 2004, Willis asked plaintiff not to discuss his online column at work because it upset the department's secretary.[3] Though plaintiff complied, the secretary continued to read his columns and eventually complained about them to the university counsel. Also in the spring of 2004, faculty members described plaintiff to the local paper as "a wannabe right wing pundit," "mentally unbalanced," and a "pathological liar." (Pl.'s Resp. Exs. 5-6.)

In the summer of 2004, Levy became the interim chair of the department. That fall, she met with plaintiff and voiced her concern that his writings contained mean-spirited personal attacks directed toward the department secretary, claiming that they were hurting department collegiality. Plaintiff defended his right to write what he wanted, explaining that he was reacting to the secretary's having criticized his views in front of students. Plaintiff indicated his desire to emulate Ann Coulter's writing style, while Levy encouraged him to write in a more scholarly manner, like William F. Buckley. Levy suggested

---

[3]Plaintiff has not identified evidence that any named defendant knew of or encouraged Willis's request.

7

that she meet with plaintiff and the secretary to mediate the dispute, but plaintiff declined. (Adams Dep. 42-44, 57-58; Levy Dep. 76-81; Levy Decl. ¶¶ 9-11.) Levy never demanded that plaintiff change his writing style or stop writing his column.

In the spring of 2005, the UNCW Faculty Senate continued a long-running debate over whether to add "collegiality" as an official criterion for Reappointment, Promotion, and Tenure. Their consideration of the issue in 2005 was prompted in part by defendant DePaolo, who supported the proposed addition as a result of the controversy over plaintiff and his writings. The Faculty Senate ultimately rejected the proposal. (Pl.'s Resp. Ex. 7.)

Levy completed plaintiff's 2004 evaluation in the summer of 2005. The evaluation catalogued plaintiff's work in four specific areas, teaching, advising, research, and service.

> **Teaching:** Plaintiff taught three courses in the spring 2004 and three in the fall 2004, teaching about 170 students overall. His courses were "well-prepared and up-to-date." Students rated him "above average to excellent." Peer reviewers rated plaintiff's teaching as "good" (average in the department). Each semester, at least one student recognized plaintiff for making an outstanding contribution to his or her undergraduate career.[4]

> **Advising:** Plaintiff advised approximately 25-30 students each semester in 2004.

---

[4] Plaintiff claims, and the court accepts as true, that Levy failed to include in this evaluation a teaching award plaintiff earned in 2004.

**Research:** Plaintiff had one article published in 2004 in an excellent peer-reviewed journal. He had one other article submitted for publication. His colleagues ranked this as "good," which was about average in the department.

**Service:** Plaintiff's service was "noted mostly by his absence." He "participated little in department business and meetings" and "neglected to fulfill his assigned obligation as a classroom observer for a junior faculty member." Plaintiff served as a faculty advisor to student organizations and as a contributor and commentator on political issues in the community and nation.

(Compl. Ex. 40.) In the "Summary and Goals" section of plaintiff's evaluation, Levy wrote that plaintiff "appear[ed] to have slowed his productivity as his efforts are directed elsewhere." (Id.) She encouraged plaintiff to participate more in department affairs and, noting his likely pursuit of a promotion, suggested that to be successful, "he will need to increase his productivity in scholarship and publication in peer-reviewed academic outlets." (Id.).

Defendant Cook became department chair in August 2005. During the 2005-2006 school year and into the summer of 2006, plaintiff's columns generated controversy and drew the attention of defendants DePaolo, Cordle, and Cook. (See Pl.'s Resp. Ex. 3 at 66.) For instance, plaintiff chose in one column to respond to a letter he received from the Vice President of the National Organization for Women's Orlando, Florida chapter. Among other things, plaintiff's column suggested members of the writer's

organization were too preoccupied with "masturbation and partial-birth abortion advocacy" to read books or news articles in their entirety; "detached from reality"; "stupid enough to think they can achieve political equality by killing their off-springs"; "irrational [and] hopelessly caught up in the past"; and should change their name from NOW to "Totally Hysterical Emotional Nabobs" (THEN). (Snowden Dep. Ex. 8.) An individual from outside the university brought this to the attention of UNCW faculty and administrators. In debating how (if at all) to respond, Snowden suggested the university might "interpret the . . . article as sabotage," given its graphic content and plaintiff's inclusion of his place of employment and job description at the conclusion of the article. (Id.)

In the second incident highlighted by plaintiff in his response brief, a group called the "Gender Mutiny Collective" wrote to defendants DePaolo, Cordle, and Cook, among others, about plaintiff's "transphobic essays," concerned that plaintiff would "pass on his transphobic attitude to his law enforcement students, thus perpetuating transphobia and transphobic violence." (Cook Dep. Ex. V.) Defendant DePaolo wrote to defendants Cordle and Cook and another individual (Paul Hosier), stating, "Please respond to me concerning the charge of passing

on transphobic views to students." (Id.)[5]   Cordle and Cook

responded, with Cook noting no student complaints regarding the

issue and supporting the notion that plaintiff's discussion of

transgender issues in his class, if it occurred, would fall

within the ambit of academic freedom.  (DePaolo Dep. Exs. 6-7.)

## II. Plaintiff's Application for Promotion to Full Professor

At the end of July 2006, plaintiff formally applied for

promotion to full professor.   The UNCW Faculty Handbook set

forth "guidelines" for "interpreting and applying" the criteria

for promotion.  These guidelines principally explained that

> the cumulative performance record of the faculty
> member under consideration is evaluated in four areas:
> teaching, research or artistic achievement, service,
> and scholarship and professional development.    The
> faculty member's cumulative performance record should
> demonstrate evidence of steady growth and maturation.
>
> [E]xcellence in teaching and in artistic achievement
> or research accomplishments rank highest among the
> criteria for tenure and promotion decisions.    To
> preserve the strength and diversity of disciplines in
> the College of Arts and Sciences, the . . . criteria
> will be reviewed with sufficient flexibility to permit
> recognition of departmental needs and individual
> faculty contributions.
>
> . . . [M]eeting any quantifiable measures provided
> does not guarantee the award of tenure or promotion.
> It is the responsibility of the faculty member being
> reviewed to provide persuasive documentation that
> qualitative criteria as well as any quantifiable
> accomplishments have been met.   In addition, the

_____

[5]Plaintiff characterizes this one-sentence email as
defendant DePaolo "order[ing]" defendants Cordle and Cook to
"investigate" whether plaintiff was passing on transphobic views
to students.  (Pl.'s Resp. Br. at 6.)

department, college, and university consider the individual's potential for future contributions to continuing and projected departmental programs and to institutional plans.

(Faculty Handbook, Cook Decl. Ex. 9.) Concerning the two highest-ranking criteria, excellence in teaching and in artistic achievement or research accomplishments, the Faculty Handbook contained specific language regarding the requirements for promotion to full professor.

**Teaching**: Teaching excellence is expected for promotion to the rank of professor. It is expected that such excellence will be reflected in teaching performance and content and in teaching activities outside the classroom. Teaching excellence can also be demonstrated by the sharing of teaching skills through such activities as the mentoring of junior faculty, attendance and presentations at teaching workshops, and papers on teaching models and techniques.

**Research accomplishments and artistic achievement**: For promotion to the rank of full professor, a faculty member is expected to demonstrate a tangible record of professionally-reviewed substantial contributions to one's discipline. Although a candidate for the rank of professor is usually expected to present more tangible evidence of accomplishment than that of the associate professor rank, the difference in artistic and research expectations for a full professor is not solely quantitative. Greater quality, maturity, significance and originality of artistic achievement or research accomplishment are expected at this rank.

(Id.) The "service" promotion criterion was similar at all levels of promotion, and was defined as "formal and informal professional activities on behalf of the faculty member's department, college, university, profession, and the community

at large." (Id.) For promotion to full professor, the university required evidence of growth and leadership in these areas. Finally, for "scholarship and professional development," the university looked for "activities that maintain and enhance a faculty member's professional competence[,] reflected primarily in growth and improvement in teaching, research accomplishments and artistic achievement, and service contributions." (Id.) Elsewhere it is made plain that these four criteria in practice collapse to three: teaching, research, and service, with the requirements for "scholarship and professional development" diffused through these three.

As department chair, defendant Cook at one point advised a new faculty member that the research criterion of the "tenure/promotion standard" had no specific numeric requirement. However, she explained that to remain on "Graduate Faculty status" required a "lower limit" of one peer-reviewed journal article every two years, with a "higher expectation" of one peer-reviewed journal article per year. (Cordle Dep. Ex. A; Cook Dep. 19-22.)[6] She stressed that quality mattered, not just

_____

[6]Plaintiff erroneously refers to Cook's statements as pertaining to the standard for promotion to full professor. (Pl.'s Resp. Br. at 7.) There is no indication in the record that Cook was referring here to anything beyond the requirements for maintaining "Graduate Faculty status." Moreover, as this advice was given to a new faculty member on the path to tenure, it is unclear whether Cook's statements, even if they applied to this subcategory of promotion decision, would apply to the

quantity, and that the parameters she had set out were "strictly advisory and not a guarantee" of a particular outcome. (Id.)

In her deposition, former interim department chair Levy explained that there was "no magic number" of publications for promotion to full professor, and that the focus was on what the professor had done since the last promotion. (Levy Dep. 112 ("[T]he total number would be less important than the number since the last promotion.").) Pressed to specify a range, Levy allowed only that the required number of publications was "more than one," but did not indicate whether she meant "per year" or for some other period of time, again reiterating that there was "no magic number." (Id. at 113.)[7]

---

university's separate expectations of applicants for promotion to full professor. Plaintiff also offers no support for his equating the phrase "higher expectation," as used by Cook, with "exceeding the standard" for promotion. (Id.)

[7]Citing this deposition testimony, plaintiff suggests that Levy "looks for at least one publication since tenure." (Pl.'s Resp. Br. at 7.) Putting aside that "at least one" is not the same as "more than one," the most plaintiff-friendly view of Levy's comment is that "more than one" signified a bare minimum threshold for promotion, not what Levy was "look[ing] for" (i.e., expected) from candidates for promotion. These comments do not contradict in any way the overwhelming record evidence that there was no "magic number" or "safe" number of peer-reviewed journal articles, and that quality was more important to tenure promotion decision than quantity. It is therefore irrelevant whether Levy meant more than one per year or more than one since the faculty member's most recent promotion, but for the sake of resolving the instant motion the court will assume she meant the latter.

Defendant Cook was required to decide whether to recommend promotion after consultation with senior faculty. A recommendation to promote plaintiff would allow the application to proceed to review by the Dean, Provost, Chancellor, and/or Board of Trustees. On the other hand, Cook's recommendation against promotion would end the process.

Before meeting with the department's senior faculty, Cook solicited written comments from them on plaintiff's application. The court here summarizes the written evaluations with which plaintiff takes issue. (Pl.'s Resp. Br. at 8-9, referring to Rice Decl. Ex. 1, Cook Dep. Exs. D, G, I-L, Adams Decl. Apps. 4-5.).[8]

Dr. John S. Rice ("Rice") believed that plaintiff was strong in the teaching category but that his research record was less impressive. Rice was concerned that plaintiff's production had decreased since tenure, and he lamented the fact that all but one of plaintiff's refereed publications were co-authored (noting that, in his experience, "a single authored article often requires more time and research effort than a co-authored piece," and that "[f]aculty reviewers . . . tend to credit

---

[8]Plaintiff also cites his declaration in support of his response to defendants' motion. (Adams Decl. ¶ 13.) This paragraph indicates that plaintiff produced five publications between his prior promotion and the comments in question, not four as indicated in various professors' review comments. The court assumes plaintiff's count is accurate in resolving the instant motion.

single authored publications more."). (Rice Decl. ¶ 17.) Rice also indicated that plaintiff's peer-reviewed articles had not been published in the best or most estimable journals.

Plaintiff listed his online column and a related book in his application, so Rice reviewed these as well. He concluded that they did not show skill "in using sociological theories, concepts, or methods," and were not "scholarly work by the measures of our discipline." (Id. at 18.) Rice "had difficulty recognizing [plaintiff] as a scholar within our field" because he had not, in Rice's opinion, developed a national reputation in sociology, criminology, or criminal justice. (Id.) Rice did give plaintiff some credit, however, for his national reputation in politically conservative circles. He also gave plaintiff credit for his service to conservative groups and causes, though he voiced concern about plaintiff's public denigration of his UNCW colleagues, suggesting that such articles or columns did not constitute "service to the department, college, or university." (Id. at 20.)

Defendant Levy indicated that plaintiff's teaching was "strong." (Cook Dep. Ex. G.) She stated, however, that his research was "weak," noting few publications from 1998 to 2006 (the period since plaintiff's most recent promotion), with only one publication single-authored. During the same period, Levy noted, plaintiff had only made three professional conference

16

presentations. Levy also had problems with plaintiff's record of service to the university and the department, characterizing them as "very minimal" and "not sufficient." She stated, "He had been advised in previous years to be a more active university participant, but must have chosen to decline this activity." (Id.)

Dr. Michael Maume ("Maume") recommended that plaintiff's application be approved, noting his "consistently excellent" teaching performance and "tangible record of research," citing four articles since 1998 and another forthcoming. Maume did write, however, that "[plaintiff] has the freedom to pursue whatever line of research he wishes, but I wish that he would consider revising the tone of his statements regarding mainstream academic research." (Cook Dep. Ex. I.) Maume also noted that plaintiff had "a less extensive service record at the college and university levels than one would like to see of someone going up for full professor, [though] he has certainly done his share of service at the departmental levels and outside the university." (Id.)

Dr. Darrell Irwin ("Irwin") "lean[ed] towards supporting" plaintiff's application for promotion, believing that he had "fulfilled the bare minimum of what is required at the professor rank at UNCW." (Cook Dep. Exs. J-K.) But he called plaintiff's research "sporadic" and indicated that the record of plaintiff's

publications was bolstered by joint authorship. He also called into question whether plaintiff's forthcoming journal article would be better classified as research or an "opinion piece" such as those found on blogs, websites, or in self-published books. He complimented a few of plaintiff's older journal articles but was lukewarm on plaintiff's review of legal cases and suggested a book authored by plaintiff (published in 2004) "[did] not bring any scholarly data forward . . . and generally detracted from the scholarship at the department." (Id.) Irwin also noted that plaintiff had made "few" presentations at professional conferences but that his mentoring of student work was "considerably more robust." (Id.)

In Irwin's view, plaintiff's record of publishing constituted "active scholarship" and "met the qualifications for promotion." (Id.) Irwin also felt that plaintiff met the requirement for promotion to full professor in teaching. Irwin felt that plaintiff did not meet the "service" criterion for promotion due to his lack of participation in university and department activities in recent years ("[h]is role as a departmental citizen seems an afterthought") and his alienation of groups that traditionally supported higher education initiatives. (Id.) Despite his misgivings, and noting the relative insignificance of the service criterion, Irwin recommended that plaintiff's application be approved.

Dr. Gary Faulkner ("Faulkner") complimented aspects of plaintiff's teaching, categorizing it overall as "average to maybe above average," though he wondered if this fit the promotion standard of teaching excellence ("distinguished accomplishment in teaching"). (Cook Dep. Ex. L.) Faulkner characterized plaintiff's record of publications as "a tad bit sparse" but still a "tangible record of achievement." (Id.) He highlighted that plaintiff had not received any grants and had given three paper presentations. With respect to the service criterion, Faulkner indicated that plaintiff had served on three "rather minor" university committees, had "good" department service, "seem[ed] to have good" faculty advisor service, and had "weak" service to the community. Faulkner believed that plaintiff's lectures around the country "should be acknowledged, however few are related to his academic field." (Id.)

Faulkner would not say that plaintiff had a "reputation as an excellent teacher" and was "recognized as a scholar within his field." (Id.) To Faulkner, plaintiff's credentials made "a somewhat weak case" for promotion, and he indicated he would feel more comfortable supporting plaintiff "if he were to shore up his research a bit and convince me a little more of his pedagogical skills." (Id.) He offered his prediction that a recommendation by Cook to promote plaintiff would be rejected at higher levels of university review if the department could not

19

offer a strong case for promotion based on plaintiff's performance since his last promotion. Faulkner did not indicate whether he would support plaintiff's application.

Another faculty member characterized plaintiff's research record as "non-existent," calling his writings "opinion pieces, slander and vicious gossip." (Cook Dep. Ex. D.) Yet another found many of plaintiff's writings "offensive because they insult the department and university with partial truths, misrepresentations, and exaggerations." (Id.)

After collecting these and other faculty comments on plaintiff's application, Cook circulated a document to senior faculty repeating the criteria for promotion to full professor and summarizing the comments she received by category and reprinting selected comments, both positive and negative. (Cook Dep. Ex. D.) She noted that at that point three faculty members were in favor of recommending approval of plaintiff's application, two were opposed, and four were ambivalent or unsure.

On September 14, 2006, the department's senior faculty met to discuss plaintiff's application. All present had the opportunity to comment on the application as it related to the promotion criteria in each category: teaching, research and service. Next, the faculty had a general discussion about plaintiff's application. Following this discussion, the senior

faculty voted on plaintiff's application. By unanimous consent of the faculty, Snowden, who was absent due to illness, was allowed to cast her vote by proxy. The final tally was 7-2 against plaintiff's application for promotion. The following day, Cook sent a memorandum to defendant Cordle, Dean of the UNCW College of Arts and Sciences, memorializing the decision of the department that plaintiff's record did not merit promotion to full professor, and adopting that decision as her own.[9] Because Cook's decision was final, the dean, provost, chancellor, and board of trustees never reviewed plaintiff's application.

Plaintiff sought written justification for the decision to deny his application as well as the vote count. (See Compl. Ex. 47.) On September 18, 2006, Cook sent Cordle and others the first draft of a memo she was preparing to send to plaintiff. In the text of her email she said the draft memo "accurately reflects the sentiments of the senior faculty and my own." (Cook Dep. Ex. O.) She went on to say, with respect to the area of teaching, that "the record was adequate, though the discrepancies between the [student evaluations] and the peer-evaluations generated some concern." (Id.) With respect to research, she stated, "the record was inadequate to merit

_____

[9]Although Cook could have gone against the senior faculty vote and recommended promotion, she chose not to do so.

promotion." She specifically pointed to plaintiff's "thin" record of scholarly productivity, with "three peer-reviewed publications since tenure and promotion to Associate Professor with one more in press; too few presentations at professional conferences within the discipline; one non-refereed book published by a non-academic publisher; and no grant submissions to maintain an active research agenda." (Id.) In the area of service, Cook said the record was "adequate" but that concerns were raised regarding plaintiff's lack of service to the university or scholarly community. Cook invited plaintiff to talk with her about available strategies and options for resubmission of his application for promotion. (Id.)

Cook sent the final version of her memorandum to plaintiff on September 21, 2006. In it she characterized the decision as in accordance with the "overwhelming consensus" of the senior faculty as well as her own views. (Compl. Ex. 48.) She did not include the vote count or the detailed breakdown of the decision by teaching, research, and service criteria as she had in her draft memorandum. She did, however, offer to provide plaintiff guidance on developing a stronger record for a future promotion application. Plaintiff responded seeking more detail, and reiterating his desire to know the vote count so he would know "how close" he came to being promoted. (Compl. Ex. 49.)

On September 29, 2006, Cook sent another memorandum to plaintiff. After reminding plaintiff of the criteria for promotion to full professor, Cook explained that the "overriding concern regarding [plaintiff's] record to date [was] in the area of scholarly research productivity," and that plaintiff's record since his last promotion did not demonstrate a cumulative tangible pattern of expertise in the discipline. (Compl. Ex. 50.) She added that plaintiff's teaching, while the strongest aspect of his application, did not meet the promotion standard of "distinguished accomplishment." And finally, she wrote that plaintiff's record of service to the department, college, university, and profession was "insufficient for promotion." (Id.) In response to plaintiff's request for the results of the vote, Cook declined to disclose the count but indicated to plaintiff again that the "overwhelming consensus" of the senior faculty was that promotion was unwarranted. (Id.)[10]

---

[10]Plaintiff argues in his brief that this memorandum represented a dramatic departure from Cook's previous position, which he characterizes as having found that his teaching and service were "adequate for promotion." (Pl.'s Resp. Br. at 10.) This phrase ("adequate for promotion") quotes an email sent by defendant Cordle (who never reviewed plaintiff's application) to Cook in response to the September 18 draft. The email reflects Cordle's understanding of Cook's memorandum. The language Cook actually used, noted above, was far more ambiguous ("within the area of teaching, the record was adequate, though the discrepancies between the [student evaluation] scores and peer-evaluations generated some concern"; "Within the area of service the record was adequate, though concerns were raised regarding your lack of service . . . [and] some concern was expressed

## COURT'S DISCUSSION

### I.  Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues.  Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993).  Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial.  Anderson, 477 U.S. at 249.

---

regarding the negative affects of your service record on members of the department.").  (Cook Dep. Ex. O.)

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

## II. Analysis

As outlined supra, plaintiff's amended complaint alleges (1) religious discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 (2000) ("Title VII"); (2) viewpoint discrimination and retaliation for protected expression, in violation of 42 U.S.C. § 1983 and the First Amendment; and, (3) denial of equal protection of the laws, in violation of § 1983 and the Fourteenth Amendment. The court previously dismissed plaintiff's claims for monetary damages against defendants in their official capacities and plaintiff's Title VII claims against defendants in their individual capacities. Defendants now move for summary judgment on all remaining claims.

## A. Title VII Religious Discrimination Claim

The court notes at the outset that federal courts review university tenure and promotion decisions "with great trepidation," consistently applying "reticence and restraint" in reviewing such decisions. Jimenez v. Mary Washington College, 57 F.3d 369, 376-77 (4th Cir. 1995). Courts "do not sit as a super personnel council" to review these decisions, Jimenez, 57 F.3d at 376 (citations omitted), and they are reluctant to interfere with the "subjective and scholarly judgments" made in reaching those decisions, Smith v. University of North Carolina, 632 F.2d 316, 345-37 (4th Cir. 1980).

> Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

Jimenez, 57 F.3d at 377 (citing Kunda v. Muhlenberg College, 621 F.2d 532, 548 (3d Cir. 1980)).

Accordingly, the court's review of the promotion denial is narrow, limited to deciding only "whether the appointment or promotion was denied because of a discriminatory reason." Smith, 632 F.2d at 346. Title VII is "not a medium through which the judiciary may impose professorial employment decisions on academic institutions." Jimenez, 57 F.3d at 377.

To prove his Title VII claim, plaintiff must demonstrate that UNCW treated him differently than other employees because of his religious views or beliefs. See Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1017 (4th Cir. 1996). To do this, he has to provide "direct or indirect evidence whose cumulative probative force supports a reasonable inference" of discrimination. Id. (quotations omitted).

Contrary to plaintiff's claims, he has not brought forth direct evidence of religious discrimination. He points out that he "spoke of his conversion to Christianity several times prior to his promotion application," including in columns and a book that he submitted as part of his promotion application. (Pl.'s Resp. Br. at 26.) From this he surmises that defendants' consideration of these materials (at plaintiff's behest) as part of his promotion application and the subsequent denial together constitute direct evidence of discrimination. Plaintiff's conjecture does not satisfy the law's requirement of "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Rhoads v. F.D.I.C., 257 F.3d 373, 391-92 (4th Cir. 2001) (quotations omitted). The court has reviewed the entire record in this matter and finds no evidence that fits the requirement outlined in Rhoads, with respect to the promotion denial or any other action taken by defendants.

In the absence of such evidence, plaintiff can still prevail on his claim using the three-part burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, plaintiff must establish a prima facie case of religious discrimination. In the failure to promote context, he needs to show that (1) he was a member of a protected group, (2) he applied for but was denied the promotion in question, (3) he was qualified for the promotion, and (4) he was rejected for the promotion under circumstances giving rise to an inference of unlawful discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994); Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 928 F.2d 118, 121 (4th Cir. 1991). If plaintiff establishes a prima facie case, the burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for the promotion denial. Assuming they do so, plaintiff will then need to show that defendants' proffered reason was merely a pretext for unlawful discrimination. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004).

Plaintiff was a member of a protected group, and he applied for and was denied the promotion in question. At the third step in the prima facie analysis, plaintiff must show that he was qualified for the promotion. See Carter, 33 F.3d at 458. This is an odd question in the context of this case. In many Title VII cases, an employee is rejected from among many applicants,

28

or passed over for a promotion in favor of a peer. Here, however, plaintiff was in an applicant pool of one. There has been no suggestion of a quota system at work, or of other limitations on the department's organizational or financial capacity to promote plaintiff. Instead, if the department (specifically, Cook) determined he was qualified for the promotion, he would receive it. Rather than decide the ultimate issue here, in the context of the prima facie case analysis, the court assumes without deciding that the only "qualification" required here was status as an associate professor at UNCW. Plaintiff met this criterion.

At the fourth step, plaintiff must show that he was denied the promotion under circumstances giving rise to an inference of unlawful religious discrimination. Plaintiff argues that he meets this criterion because he was the "only Christian conservative" in the department. But plaintiff's political views are not at issue in his Title VII claim, and he forecasts no evidence that he is the department's only Christian. Plaintiff also compares his qualifications to those of others in the department. But these facts are irrelevant to plaintiff's Title VII claim without some arguable link to religious discrimination. Finally, plaintiff appears to assert that the fact that some of his writings referred to religious issues, and were considered (at his request) in the promotion evaluation

process, necessarily give rise to an inference of unlawful religious-based discrimination. But as with plaintiff's direct evidence argument, there is nothing beyond conjecture to support this inference, and plaintiff is therefore unable to establish a prima facie case of religious discrimination.

Even if plaintiff could meet his initial burden, defendants have proffered legitimate, non-discriminatory reasons for the denial, principally plaintiff's sparse publications record and his low number of refereed publications with significant scholarly merit. Defendants' burden here is not particularly onerous. See Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277 (4th Cir. 2004) (stating that the employer's burden is one of production, not of persuasion).

At the final step in the burden-shifting framework, plaintiff cannot show that defendants' proffered reasons were merely pretext for unlawful religious discrimination. First and foremost, as noted supra, plaintiff cannot succeed on his claim due to the absence of record evidence from which a jury could conclude that defendants based any of their decisions on plaintiff's religious views or beliefs. Within the void thus created, plaintiff attempts to support his claim through comparisons to the records of other professors. Even if plaintiff's claim had the requisite grounding in religious discrimination, the court would be wary of engaging in this

comparison of records to support a pretext analysis. Plaintiff's argument on this score amounts to a suggestion that Cook 'got it wrong' when she deemed him undeserving of promotion. In this regard, plaintiff's claim bumps up against the federal courts' resistance to interfere with the "subjective and scholarly judgments" involved in professorial employment decisions. See Jimenez, 57 F.3d at 376-77; Smith, 632 F.2d at 345-37; Kunda, 621 F.2d at 548.

Plaintiff argues that he fulfilled UNCW's promotion criteria in the required areas of teaching, research, and service. He cites Cook's unsent draft email as an indication that he met the teaching and service criteria, categorizing the memoranda she actually sent as "simply litigation-motivated spin." (Pl.'s Resp. Br. at 27.)[11] On the research criterion, he focuses on the cumulative number of refereed articles he had produced at the time of his application (in total, not just between promotions), giving short shrift to overwhelming record evidence of the significance to the promotion decision of 1) the

_____

[11]The laser-like focus by both parties on Cook's actions and attitudes highlights a key point. Cook retained ultimate authority over the decision of whether to recommend plaintiff's promotion. She could have, for example, ignored the 7-2 senior faculty vote and recommended the promotion. Or, if the vote had been 7-2 in favor of the promotion, she could have still recommended denying the promotion, ending the application process. Thus, although others added their voices to the mix, Cook alone controlled the adverse employment action at issue here.

quality of publications, and 2) an applicant's cumulative record since the most recent promotion. (Pl.'s Resp. Br. 18-19, 27.) In presenting his qualifications, plaintiff also focuses the court's attention on comparisons between his own research and "left-leaning research conducted by Dr. Hossfeld." (Pl.'s Resp. Br. 18, 27.) He appears to argue that the quality of Hossfeld's writings and his own were similar in scholarly merit and only differed in the relative positions of the two professors on the political spectrum.

Federal courts shun opportunities to second-guess determinations like these, which deal entirely with the scholarly merit of professors' publications. See Jimenez, 57 F.3d at 376-77; Smith, 632 F.2d at 345-37; Kunda, 621 F.2d at 548. The question courts ask instead is "whether the . . . promotion was denied because of a discriminatory reason." Smith, 632 F.2d at 346. Finding no evidence in the record to support plaintiff's allegations of religious discrimination, the court grants summary judgment in defendants' favor on plaintiff's Title VII claim.

## B. Plaintiff's § 1983 First Amendment Claims

A First Amendment retaliation claim under § 1983 follows the same proof scheme as plaintiff's Title VII claim. Williams v. Cerberonics, 871 F.2d 452, 455 (4th Cir. 1989); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.

32

1985). Here, however, plaintiff's prima facie case is the three-pronged test laid out in McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998) and restated in Ridpath v. Bd. of Governors Marshall University, 447 F.3d 292 (4th Cir. 2006).

> First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. Second, the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public. Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.

Ridpath, 447 F.3d at 316 (quotations and citations omitted) (the "McVey Test").

The first prong of this test asks whether a public employee spoke on matters of public concern, and if he did, whether in doing so he acted as a citizen or as an employee. In this case, plaintiff's retaliation claim is rooted in his columns, publications, and presentations, many of which criticized defendants, other UNCW administrators or staff, or the university as a whole, and others of which dealt with controversial material and reflected plaintiff's conservative views. The novelty of this claim (and the entire case) comes from the fact that plaintiff included these materials in his application seeking promotion, thus forcing the very people he criticized to make professional judgments about this speech.

33

Under these odd factual circumstances, it makes sense for the court to bifurcate its inquiry, first addressing the promotion decision and then separately addressing the other alleged retaliatory employment actions.

1. The Decision Not to Approve Plaintiff's Promotion

The Supreme Court held in Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) that when a public employee makes a statement pursuant to his "official duties," he does not "speak as a citizen." In other words, "the First Amendment does not shield the consequences of 'expressions employees make pursuant to their professional duties.'" Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Garcetti, 547 U.S. at 426). A court must focus not on the content of the speech but on the role the speaker occupied when he said it. Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007) (quoting Garcetti).

Plaintiff's inclusion of his columns, publications, and presentations in his application for promotion is an implicit acknowledgement that they were expressions made pursuant to his professional duties--that he was acting as a faculty member when he said them. Plaintiff correctly asserts that UNCW administrators and faculty members repeatedly disclaimed the views represented in his columns. However, to the extent this weakened the link between plaintiff's speech and his

34

professional duties, plaintiff's inclusion of the speech in his application for promotion trumped all earlier actions and marked his speech, at least for promotion purposes, as made pursuant to his official duties.

A contrary analysis would allow those in plaintiff's position to place employers in a double bind: either neglect employee requests and refuse to look at material, fueling allegations of free speech violations grounded in the refusal; or consider the material, knowing that doing so will open them up, in the event of an adverse outcome, to claims of free speech violations for basing denials on protected speech. The court concludes, under Garcetti, that the columns, publications, and presentations plaintiff included in his application constituted--in the context of the promotion evaluation-- expressions made pursuant to plaintiff's professional duties. The court further finds that the record contains no evidence of other protected speech (i.e., speech not presented by plaintiff for review as part of his application) playing any role in the promotion denial. As a result, plaintiff cannot meet his burden at the first step of the McVey test.

2. Other Alleged Retaliatory Employment Actions

Plaintiff alleges that his protected speech caused defendants to engage in four other retaliatory employment actions: (1) an "intrusive investigation" into his emails

following student accusations of intimidation and defamation, (2) an "intrusive investigation" following Snowden's allegations of workplace terrorism, (3) defendant DePaolo's support for the addition of "collegiality" to the university promotion criteria, and (4) DePaolo's request that defendants Cook and Cordle look into a claim that plaintiff was passing on transphobic views to students.

All of these allegations refer to events occurring outside the scope of the promotion evaluation process. The court's analysis, supra, of whether plaintiff's speech was made as a citizen or as an employee, is therefore inapplicable here. However, as it relates to the four alleged retaliatory employment actions discussed in this subsection, the court finds it unnecessary to resolve the citizen/employee issue due to plaintiff's complete failure to forecast evidence sufficient to withstand summary judgment on the McVey test's requirement of a causal nexus between the speech and any of the alleged retaliatory employment actions.

There is no competent record evidence of any named defendant's involvement in the university's minimal review of plaintiff's and others' email messages, undertaken only after repeated attempts by the university counsel to avoid taking such measures, and only upon repeated demands and threats of legal action. The record is also devoid of competent evidence to

36

support plaintiff's contention that the university's eventual review of plaintiff's and others' email messages bore any relationship to his protected speech.

The investigation of Snowden's workplace terrorism charge was undertaken by the UNCW police department and the State Bureau of Investigation, and not by any named defendant. Defendant Cook assisted plaintiff in bringing formal closure to the incident in the spring of 2006.

There is scant evidence of DePaolo's involvement in the debate over whether to add "collegiality" as a criterion for tenure and promotion; the measure ultimately failed; and most importantly, plaintiff has not explained how participation in such a debate constitutes a retaliatory employment action.

Finally, defendant DePaolo asked defendants Cordle and Cook to "[p]lease respond to me concerning the charge of passing on transphobic views to students." (Cook Dep. Ex. V.) Both responded, with Cook noting that she had not received any student complaints regarding the issue and that academic freedom allowed plaintiff to cover transgender issues in his class. (DePaolo Dep. Exs. 6-7.) No negative action was taken.

In summary, plaintiff cannot satisfy the three prongs of the McVey test on his First Amendment claims. Accordingly, the court grants summary judgment in favor of defendants on these claims.

## C.  Plaintiff's § 1983 Equal Protection Claim

Plaintiff alleges that defendants treated him differently than similarly situated professors due to his speech and his Christianity.  "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-40 (1985).  Plaintiff has brought forth no evidence that any action by any defendant was based on plaintiff's Christian beliefs.  Plaintiff has also not forecast evidence that any named defendant treated him differently than a similarly situated professor on any other basis. Regarding the promotion decision, the court reiterates its reluctance, and that of the Fourth Circuit, to interfere with the "subjective and scholarly judgments" involved in tenure and promotion decisions.  Smith, 632 F.2d at 345-47.  Plaintiff would have the court revisit not just his promotion decision but those of comparator faculty members as well, contrasting numbers of publications and the like.  Promotion and tenure decisions are, at bottom, individualized determinations not readily susceptible to the type of comparison plaintiff would have the court do. The court grants summary judgment in favor of defendants on plaintiff's equal protection claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The clerk is directed to close the case.

This _15ᵗʰ_ day of March 2010.

Malcolm J. Howard
MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#30